FILED IN OPEN COURT
ON 10-17-19 BeH
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

WMG

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CR-432-1FL(4)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | INDICTMENT |
| | ) | |
| CHARLES GILBERT MURPHY | ) | |

The Grand Jury charges that:

## I. INTRODUCTION

1.    CHARLES GILBERT MURPHY was an individual who resided and did business in the Eastern District of North Carolina. Murphy, both directly and through the use of various entities and individuals, engaged in a number of frauds and schemes to cause individuals and businesses to part with their money.

2.    Toxic Solutions LLC ("Toxic Solutions"), Biological Marine Remediation LLC ("Bio-Remediation"), Bio Marine Remediation LLC ("Bio-Marine"), Bio Separation Systems, LLC ("Bio-Separation"), On-Site Solutions LLC ("On-Site Solutions"), and On-Site Technologies LLC ("On-Site Technologies") were North Carolina companies created by Murphy through the use of other individuals. These companies are collectively referred to hereinafter as the "Murphy Entities." The Murphy Entities generally purported to provide environmental cleanup services and

1

products in the Eastern District of North Carolina and elsewhere. After 2017, Murphy began to use On-Site Solutions, and On-Site Solutions doing business as On-Site Technologies, for the purported purpose of selling high-end coffee machines to gas stations and other companies.

3. Murphy was subject to collection efforts by the United States Government arising from a prior fraud scheme, and had poor credit. Therefore, Murphy caused family members to open bank accounts for him in the name of the Murphy Entities. Murphy then used these bank accounts to conduct his personal business. Murphy also used family members to obtain and attempt to obtain loans from lenders.

4. In an effort to obtain loan proceeds from banks and lenders, Murphy created and caused to be created various false documents which were given to bank and lender underwriters and agents in support of loans. Such false documents included false bank statements for Toxic Solutions, false tax returns for Toxic Solutions, and false statements regarding revenue.

5. In addition to his attempts to obtain lender monies using false documents, Murphy also used the Murphy Entities to obtain money from individuals and entities under false and fraudulent pretenses. In general, Murphy represented that the Murphy Entities performed environmental cleanup activities, such as water remediation. Murphy purported to offer to various entrepreneurial victims the opportunity to purchase exclusive rights to perform environmental cleanup services

2

in a given geographic area. Murphy also purported to sell the equipment necessary to perform the cleanup services. In furtherance of the scheme, Murphy frequently presented false documents to the entrepreneurs to make it appear that funds had been allocated for services to be performed in the geographic area where the victims had purchased the exclusive rights. In reality, the documents justifying the exclusive rights purchase were falsified, and Murphy took the money without providing all of the equipment purchased.

6. After Murphy conducted the scheme in the name of one of the Murphy Entities, he shifted the scheme to one of the other Murphy Entities to perpetuate the fraud.

7. Murphy also began to use some of the Murphy Entities for the purposes of obtaining merchant cash advances from commercial lenders. In doing so, Murphy misrepresented, among other things, the revenues of his company, and the fact that he had obtained other merchant cash advances.

8. In addition to the foregoing schemes upon lenders and individuals, Murphy also conducted a fraud upon banks by presenting and causing to be presented to the banks numerous false and fraudulent checks.

9. In July of 2018, the Federal Bureau of Investigation interviewed Murphy concerning the foregoing schemes. After being warned that lying to the FBI was a federal offense, Murphy nevertheless made numerous materially false and fraudulent statements during the interview.

## COUNTS 1 AND 2

10.     Beginning at a time unknown, but no later than October of 2015, and continuing to a time unknown, but no earlier than January of 2016, within the Eastern District of North Carolina and elsewhere, the defendant, CHARLES GILBERT MURPHY, aiding and abetting others known to the grand jury, knowingly executed and attempted to execute a scheme to obtain any of the moneys, funds, credits, assets, and other property owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises.

### MANNER AND MEANS

11.     Introductory paragraphs 1 through 9 are realleged and incorporated into this count.

12.     MURPHY caused a loan application to be submitted to each of the banks referenced in the table below.   The banks referenced in this Count were "financial institutions" as that term is defined in Title 18, United States Code, Section 20. These banks requested various information and documents during the loan application and underwriting process.

13.     MURPHY created and caused to be created the false and fraudulent documents referenced in the table below.   The false documents purported to show the banks that the Murphy Entities possessed significant assets or revenue.   In fact, as MURPHY then and there knew, the Murphy Entities did not possess the assets or

4

collect the revenues referenced, and the documents purporting to represent the same were fabricated.

14.     MURPHY transmitted and caused to be transmitted to the banks the false and fraudulent documents in support of the loan referenced on each respective line of the table below.

15.     The banks referenced in the table below disbursed loan proceeds in reliance upon the fraudulent documents referenced above.

16.     Although Murphy caused the loan applications to be submitted in the names of others, the loan proceeds were diverted to MURPHY, and MURPHY spent the proceeds on his own personal interests.

17.     Ultimately, the loans referenced in the table below went into default, resulting in losses to the banks.

## EXECUTION OF THE SCHEME

18.     On or about the dates set forth in the table below, each entry constituting a separate count of this Indictment, within the Eastern District of North Carolina and elsewhere, the Defendant, CHARLES GILBERT MURPHY, aiding and abetting others known to the grand jury, executed and attempted to execute the scheme and artifice described above, in that, for each financial institution referenced below, MURPHY caused to be transmitted the false documents referenced below, in support of each loan referenced below:

5

| COUNT | DATE | BANK LOAN | FALSE DOCUMENT(S) |
|---|---|---|---|
| 1 | 10/9/2015 | $62,931 from WebBank | (1) Trust Atlantic Bank Statements for Toxic Solutions fabricated in whole, and to reflect higher account balances; (2) First Citizens Bank deposit slip for Toxic Solutions fabricated to reflect account deposit exceeding $1 Million (3) 2014 U.S. Return of Partnership Income, Form 1065, for Toxic Solutions fabricated to reflect gross receipts of $950,445. |
| 2 | 12/2/2015 | $10,000 from First Citizens Bank | False loan application for Toxic Solutions reflecting gross annual revenue of $350,000. |

Each of the transactions identified in the foregoing table constituting a separate violation of Title 18, United States Code, Sections 1344 and 2.

## COUNTS 3 AND 4

19. Paragraphs 1 through 17 are realleged and incorporated into this Count.

20. On or about the dates listed in the table below, each entry constituting a separate count of this Indictment, in the Eastern District of North Carolina, and elsewhere, CHARLES GILBERT MURPHY, defendant herein, aiding and abetting others known to the grand jury, did knowingly make and cause to be made the false statements and reports referenced in each row of the table below, for the purpose of influencing in any way the action of the banks referenced in each row of the table below, upon an application, advance, commitment, and loan from said banks:

6

| COUNT | DATE | BANK LOAN | FALSE STATEMENT |
|---|---|---|---|
| 3 | 10/9/2015 | $62,931 from WebBank | (1) Toxic Solutions maintained account balances at Trust Atlantic Bank of $790,436; $825,864; and $962,115 in May, June, and July of 2015, respectively; (2) Toxic Solutions received a $1,013,927.15 deposit into its First Citizens Bank account on October 9, 2015; (1) Toxic Solutions had gross receipts of $950,445 in 2014. |
| 4 | 11/17/2015 | $10,000 from First Citizens Bank | Toxic Solutions had gross annual revenue of $350,000. |

Each of the transactions identified in the foregoing table constituting a separate violation of Title 18, United States Code, Sections 1014 and 2.

## COUNTS 5 THROUGH 11

### THE SCHEME

21. Beginning at a time unknown, but no later than May of 2011 and continuing to in or about January of 2018, in the Eastern District of North Carolina and elsewhere, the Defendant, CHARLES GILBERT MURPHY devised and intended to devise a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

22. Introductory Paragraphs 1 through 9 are realleged and incorporated by reference into this Count.

23. Murphy, operating through the Murphy Entities, used CraigsList and

7

other media to advertise the sale of a protected sales territory, and the sale of the equipment necessary to operate an environmental cleanup business within the protected territory. Murphy caused advertisements to be placed in, among other places, Texas, Washington, and Pennsylvania.

24. Based upon the advertisements, individual entrepreneurs contacted Murphy to inquire about the business and equipment. Murphy communicated with the entrepreneurs by phone and email regarding the environmental cleanup business and equipment.

25. In furtherance of the scheme, Murphy typically presented to the entrepreneurs a "Letter of Agreement" in which Murphy agreed to "offer a protected territory" to the entrepreneurs, and that "all sales using the equipment purchased in this area are the property" of the entrepreneur. Murphy further represented that he would "support and help secure enough customers to have positive cash flow when equipment is delivered." In at least one instance, Murphy represented that he would make "all payments for buyer should cash flow not exceed payment at the time payment is due." Murphy also agreed to "train all buyer personal [sic] in sales, delivery, and service of equipment."

26. In furtherance of the scheme Murphy frequently presented to the entrepreneurs an invoice for the sale of, among other things, a *"225 GPM Eco system filtration system. With Chemical Absorption, perforated concrete pass through sedimentation. Vertical filtration with control pit. Porous concrete Plus filter for*

8

*low PH pass through cyclonic storage.*" The purported cost of the equipment was typically listed as $49,955. At the time of invoice, the entrepreneurs were only billed for a deposit on the equipment, which was typically several thousand dollars. Murphy promised to deliver the equipment a short time after payment.

27. In some instances, to carry out or perpetuate the scheme, Murphy presented documents to the entrepreneurs to make it appear that funds had been allocated for services to be performed in the geographic area where the victims had purchased the exclusive rights. In reality, the documents were falsified.

28. The entrepreneurs believed Murphy's representations regarding the positive cash flow he would generate or funds already allocated for environmental cleanup in the "protected area." The entrepreneurs further believed Murphy's representations regarding the $49K in equipment to be delivered following payment of their deposit. As such, the entrepreneurs paid Murphy the equipment deposits. The investors made their deposit payment via interstate wire transfer or via check.

29. After payment of the deposit funds, however, Murphy did not deliver the equipment as promised. Murphy gave various excuses to the entrepreneurs regarding the non-delivery of the equipment, but still never made delivery.

30. Ultimately, the entrepreneurs demanded the return of their deposit monies and, in many instances, Murphy agreed to refund the money. In fact, however, Murphy did not return the entrepreneurs' money. Eventually, Murphy broke contact with the victims.

9

31.   Even though Murphy took victim monies without delivering the promised equipment, Murphy continued to market the same investment in various cities across the United States, resulting in losses to additional victims.

## USE OF THE WIRES

32.   On or about each of the dates set forth below, in the Eastern District of North Carolina and elsewhere, the defendant, CHARLES GILBERT MURPHY, aiding and abetting others, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | VICTIM | WIRE |
|-------|------|--------|------|
| 5 | 1/13/2016 | M.B. | $2,000 wire transfer from Pennsylvania to Toxic Solutions bank account in North Carolina |
| 6 | 2/8/2016 | J.M. | $2,760 wire transfer from California to Toxic Solutions bank account in North Carolina |
| 7 | 3/9/2016 | C.D. | $2,775 wire transfer from Texas to Toxic Solutions bank account in North Carolina |
| 8 | 10/9/2017 | J.H. | Email transmission from Dave.onsitesolutions@gmail.com to J.H. in Pennsylvania containing fictitious award of $450,000 to On-Site Solutions and On-Site Technolgies from NCGreenfund.org |
| 9 | 10/21/2017 | J.H. | Email transmission from Dave.onsitesolutions@gmail.com to J.H. in Pennsylvania containing fictitious correspondence from j.luczaj@universitywisconsingreenbay.edu concerning strontium remediation |
| 10 | 11/14/2017 | J.H. | Email transmission from |

| | | | |
|---|---|---|---|
| | | | Dave.onsitesolutions@gmail.com to J.H. in Pennsylvania containing fictitious correspondence from t.kabat@lacrossewisconsin.gov concerning presentation for contamination cleanup. |
| 11 | 11/19/2017 | J.H. | Email transmission from Dave.onsitesolutions@gmail.com to J.H. in Pennsylvania containing fictitious correspondence from a "Bob Diamond" at b.diamond@epa.gov concerning remediation and a Portland Superfund Site. |

Each entry in the foregoing table constituting a separate violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 12 AND 13

33.    Paragraphs 21 through 32, are incorporated herein as though fully set forth in this count.

34.    On or about the dates set forth in the table below, in the Eastern District of North Carolina and elsewhere, the defendant, CHARLES GILBERT MURPHY, did knowingly possess and use, without lawful authority, a means of identification of another person, to wit, the name of said other person, during and in relation to the crime set forth in the corresponding count of this Indictment identified in the table below, felony violations enumerated in Title 18, United States Code, Section 1028A(c),

| Count | Victim Initials | Date | Corresponding Count |
|---|---|---|---|
| 12 | J.L. | 10/21/2017 | 9 |
| 13 | T.K. | 11/14/2017 | 10 |

11

Each count in the table above constituting a separate violation of Title 18, United States Code, Section 1028A(a)(1).

## COUNTS 14 AND 15

### THE SCHEME

35.    Beginning at a time unknown, but no later than October 11, 2018, and continuing to in or about October 22, 2018, in the Eastern District of North Carolina and elsewhere, the Defendant, CHARLES GILBERT MURPHY devised and intended to devise a scheme to defraud certain cash advance companies, specified herein, and to obtain money and property from said cash advance companies, by means of materially false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

36.    Introductory paragraphs 1 through 9 are realleged and incorporated by reference into this Count.

37.    In October of 2018, Murphy, operating in the name of On-Site Solutions and On Site Technologies, applied for merchant cash advances from at least two private lenders at virtually the same time. In both instances, Murphy falsified data concerning the Murphy Entities, and in one instance, lied concerning the existence of his nearly-simultaneous application for a second merchant cash advance. The cash advance companies relied upon Murphy's false representations in disbursing cash to Murphy. Upon receiving the cash, Murphy spent the funds on his own interests and then defaulted, resulting in losses to the cash advance companies.

12

38.     On or about October 11, 2018 Murphy, operating as On Site Solutions,
presented a loan application to Uptown Commercial Capital ("Uptown").     Uptown
was a commercial lending intermediary located in New York.     In his application for
a merchant cash advance through Uptown, Murphy was advised:

> By signing and faxing or emailing us your application, you certify that
> you are authorized to apply on behalf of the company whose full legal
> name appears under the Company Information portion of the Loan
> Application for a business loan from us and all information you provide
> within the loan Application and other supporting documents is true and
> complete and that you will notify us of material changes to such
> information.

39.     Despite this acknowledgement, in his application with Uptown for a
$20,000 advance, Murphy represented, among other things, that On Site Solutions
had annual business revenue of $390,000.     In fact, On Site Solutions did not have
revenue of this magnitude.     Nevertheless in reliance upon this information, Uptown
marketed the cash advance to Forward Financing SPV LLC, who in turn relied upon
the information in agreeing to advance $6,910.00 to Murphy.

40.     Just four days after applying for the merchant cash advance through
Uptown, on October 15, 2018, Murphy signed an application with Metromedia
Funding for a second different merchant cash advance.     In that application, Murphy
certified that all information and documents submitted in support of the cash advance
were true correct and complete.     Among other things, the application stated, "Do you
have any open funding?"     Metromedia Funding relied upon this and other
representations, and in turn brokered the cash advance to other lenders, including

13

Last Chance Funding Inc., doing business as The LCF Group (hereinafter "LCF") in New York.

41.    LCF reviewed and preliminary approved Murphy for a merchant cash advance, relying upon the application that Murphy previously transmitted to Metromedia Funding.   Later on the same day, October 15, 2018, at around 1:00 pm, Murphy executed a merchant cash advance agreement with LCF.   In this agreement, Murphy represented to LCF that "the information provided herein and in all of [LCF's] documents, forms, and recorded interviews, is true, accurate and complete in all respects."   Murphy further acknowledged that misrepresentations in connection with the cash advance agreement could result in legal action.

42.    Three days later, on October 18, 2018, Forward Financing wired $6,910.00 to Murphy's bank account.

43.    The next day, on October 19, 2018, a representative from LCF contacted Murphy via telephone to conduct a "merchant interview" prior to making a final decision on Murphy's prior cash advance application to Metromedia Funding. During this recorded phone call, the LCF representative asked Murphy, "Have you signed any other contracts with any other funding companies in the past week?" to which Murphy replied, "No, huh uh."   The LCF representative then asked, "Do you have any merchant cash advances out currently" to which Murphy replied, "No." The LCF representative further asked, "Have you ever had a merchant cash advance?" to which Murphy replied, "I have not."   At no time did Murphy advise LCF

14

that he had previously applied for and received a merchant cash advance from Forward Financing.

44.    Three days later, on October 22, 2018, another LCF representative contacted Murphy to conduct a "funding call."  During the course of this call, when asked by the LCF representative, "Has anything changed since the merchant interview?" Murphy replied, "No, not at all."

45.    In reliance upon Murphy's false statements to LCF and Metromedia Funding, on or about October 23, 2018, LCF disbursed $6,500 to Murphy as a merchant cash advance.

46.    Murphy received the funds referenced above from Forward Financing and LCF.  Murphy then spent the funds on his own interests.  Murphy never repaid the cash advances to Forward Financing and LCF, resulting in losses to those companies.

USE OF THE WIRES

47.    On or about each of the dates set forth below, in the Eastern District of North Carolina and elsewhere, the defendant, CHARLES GILBERT MURPHY, aiding & abetting others, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | WIRE |
|-------|------|------|
| 14 | 10/18/2018 | $6,910 wire transfer from Forward Financing Bank of America account in Virginia to On-Site Solutions bank account North Carolina. |

15

| 15 | 10/23/2018 | $6,500 wire transfer from LCF Wells Fargo bank account in California to On-Site Solutions bank account in North Carolina. |
|---|---|---|

Each entry in the foregoing table constituting a separate violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 16 THROUGH 22

48.     Beginning at a time unknown, but no later than January of 2019 and continuing to a time unknown, but no earlier than March of 2019, within the Eastern District of North Carolina, and elsewhere, the defendant, CHARLES GILBERT MURPHY, knowingly executed and attempted to execute a scheme to obtain any of the moneys, funds, credits, assets, and other property owned by and under the custody and control of financial institutions, referenced herein, by means of materially false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

49.     Introductory paragraphs 1 through 9 are realleged and incorporated into this count.

50.     Among other bank accounts, Murphy caused bank accounts to be opened in the name of Murphy Entities at CresCom Bank and First National Bank of Pennsylvania (FNB Pennsylvania).   The CresCom Bank and FNB Pennsylvania were "financial institutions" as that term is defined in Title 18, United States Code, Section 20.

51.     Murphy created and caused to be created certain fraudulent checks,

16

referenced herein, each payable to Murphy or one of the Murphy Entities.

52.    Murphy took the fraudulent checks to a local branch of either CresCom Bank or FNB Pennsylvania within the Eastern District of North Carolina.  Murphy then deposited the fraudulent checks and withdrew the funds before the fraudulent nature of the checks could be detected.

53.    Upon discovery of the fraudulent nature of the checks, the banks attempted to contact Murphy to recoup the monies, to no avail.

54.    The banks attempted to charge the fraudulent checks back to Murphy's accounts, however by that time there were insufficient funds in the accounts to cover the loss, thereby causing substantial losses to the banks.

EXECUTION OF THE SCHEME

55.    On or about the dates set forth in the table below, each entry constituting a separate count of this Indictment, within the Eastern District of North Carolina and elsewhere, the Defendant, CHARLES GILBERT MURPHY, aiding and abetting others known to the grand jury, executed and attempted to execute the scheme and artifice described above, in that, for each financial institution referenced below, MURPHY knowingly caused to be deposited the following fraudulent checks into accounts owned or controlled by Murphy:

| COUNT | DATE | BANK | FRAUDULENT CHECK |
|---|---|---|---|
| 16 | 1/28/2019 | CresCom Bank | $2,000 check from Coldspring Co., Inc. payable to Charles Murphy |
| 17 | 1/29/2019 | CresCom Bank | $2,075 check from Penfed Credit Union payable to Charles Murphy |
| 18 | 1/30/2019 | CresCom Bank | $1,500 check from Goksu |

17

| | | | Construction LLC payable to Charles Murphy |
|---|---|---|---|
| 19 | 1/30/2019 | CresCom Bank | $1,950 check from Capital City Bank payable to On Site Solutions LLC |
| 20 | 2/13/2019 | FNB Pennsylvania | $1,560 check from TEFCU payable to Charlie Murphy |
| 21 | 2/15/2019 | FNB Pennsylvania | $5,860 check from Citibank payable to On Site Solutions LLC |
| 22 | 2/19/2019 | FNB Pennsylvania | $3,300 check from First Tennessee Bank payable to Charlie Murphy |

Each of the transactions identified in the foregoing table constituting a separate violation of Title 18, United States Code, Sections 1344 and 2.

### COUNT 23

56.    Introductory Paragraphs 1 through 20 are realleged and incorporated by reference into this Count.

57.    On or about July 25, 2018 the FBI interviewed Murphy concerning his business dealings involving the Murphy Entities. Among other things, the FBI questioned Murphy regarding an October 9, 2015 loan from WebBank to his company, Toxic Solutions, and showed him documents concerning the same. At that time, Murphy falsely claimed that he had no knowledge or recollection of such a loan. In fact, Murphy worked directly with loan intermediary M.A. to secure the loan and to provide necessary documentation on the loan.

58.    During the interview, an agent showed Murphy certain bank statements and a deposit slip for Toxic Solutions that had been transmitted to WebBank to secure the loan. The deposit slip purported to show a deposit into a First Citizens Bank

18

account for Toxic Solutions which exceeded $1 Million. Additionally, multiple Trust Atlantic bank statements for Toxic Solutions purported to show that Toxic Solutions maintained balances in excess of $790,000 between May and July of 2015. Murphy acknowledged that the deposit slip and bank statements were fake. Nevertheless, Murphy denied any involvement with the creation of the documents or their transmission to WebBank in support of the loan. Murphy also feigned a lack of knowledge concerning the identity of M.A., but suggested to agents that M.A. may have fabricated the statements.

59. In fact, as Murphy then and there knew, he caused a loan application to be filed with WebBank through the loan intermediary, and further caused the fabricated bank statements and deposit slip to be transmitted to the loan intermediary, who in turn transmitted them to WebBank in support of the loan application.

60. Therefore on or about July 25, 2018, in the Eastern District of North Carolina, in a matter within the jurisdiction of the FBI, an agency within the Executive Branch of the Government of the United States, the defendant, CHARLES GILBERT MURPHY, did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations, to wit, that he had no knowledge of, and was uninvolved in, WebBank's loan to Toxic Solutions, whereas the defendant then and there knew that he caused the loan to be made and caused false documents

19

to be transmitted in support of the loan, all in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNTS 24 THROUGH 26

61.     Introductory Paragraphs 1 through 9 are realleged and incorporated by reference into this Count.

62.     On or about the dates listed in the table below, in the Eastern District of North Carolina and elsewhere, CHARLES GILBERT MURPHY, defendant herein, did willfully make and subscribe to each Form 1040 identified in each row of the table below, each of which was verified by a written declaration that it was made under the penalties of perjury and which CHARLES GILBERT MURPHY did not believe to be true and correct as to the material matter identified in each row of the table below, in that each Form 1040 which was electronically filed with the Director, Internal Revenue Service Center, stated a false amount of total income identified below, whereas MURPHY then and there knew that he had received thousands of dollars in additional income in each tax year from the Murphy Entities.

| COUNT | FILING DATE | FORM 1040 YEAR | FALSE MATERIAL MATTER |
|-------|-------------|----------------|-----------------------|
| 24 | 4/14/2014 | 2013 | Total income for 2013 was $13,114 |
| 25 | 4/13/2015 | 2014 | Total income for 2014 was $24,705 |
| 26 | 4/14/2016 | 2015 | Total income for 2015 was $15,252 |

Each row in the forgoing table constituting a separate violation of Title 26, United

20

States Code, Section 7206(1).

## FORFEITURE NOTICE

The defendant is hereby given notice that the defendant's interest in all property specified herein is subject to forfeiture.

Upon conviction of any of the offense(s) set forth in Counts One through Four, and/or Sixteen through Twenty-Two of the foregoing Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property constituting, or derived from, proceeds the person obtained directly or indirectly, as result of such offense(s).

Upon conviction of any of the offense(s) set forth in Counts Five through Fifteen, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), as made applicable by Title 18, United States Code, Section 2461(c)), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

Upon conviction of any of the offense(s) set forth in Count Twenty-Three, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(3), any property, real or personal, which represents or is traceable to any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense.

The forfeitable property includes, but is not limited to, the gross proceeds of the foregoing offenses that were personally obtained by the defendant.

21

If any of the above-described forfeitable property, as a result of any act or omission of the defendants --

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a

third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty --

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) (made applicable by Title 18, United States Code, Sections 982(b)(1) or Title 28, United States Code, Section 2461(c)), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

A TRUE BILL

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON ✓

DATE: 10/17/19

ROBERT J. HIGDON, JR.
United States Attorney

BY: WILLIAM M. GILMORE
Assistant United States Attorney

22